UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**ROGER L. FORT,**

    **Plaintiff,**

v.

**CITY OF COLUMBUS,**

    **Defendant.**

Case No. 2:20-cv-6423
JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Chelsey M. Vascura

**OPINION AND ORDER**

This matter is before the Court on Defendant City of Columbus' Motion for Summary Judgment (ECF No. 23, hereinafter "Def.'s Mot."). Plaintiff filed a Response in Opposition (ECF No. 28, hereinafter "Pl.'s Resp.") and Defendant replied (ECF No. 29, hereinafter "Def.'s Reply"). For the following reasons, the Court **GRANTS** Defendant's motion.

## I. BACKGROUND

Plaintiff Roger Fort worked as a Refuse Collection Vehicle Operator Automated (RCVOA) for the City of Columbus Public Service Department from May 8, 2005, until his termination on July 1, 2015. Mr. Fort, a Black man, alleges that he was terminated because of his race. The City alleges that Mr. Fort was terminated for keeping trash during his job in violation of City policy.

    A. **June 11, 2015 Incident**

On June 11, 2015, Mr. Fort and his coworker, Victor Smith, picked up bulk trash items at the Columbus Division of Police property room. (Fort Aff. ¶ 11, ECF No. 28-1.) Mr. Fort checked in with the Columbus Division of Police clerk and was told to remove trash items in the back and center of the property room. (*Id.* ¶ 12.) He had picked up trash from there numerous times before. (*Id.* ¶ 11.) Two other RCVOAs, Pat West and Howard Rodgers, were also assigned to pick up trash from the property room in their own trucks. (Fort Dep. at 59, ECF No. 22-1.)

1

Fort, Smith, West, and Rodgers loaded one of the other trucks and then started loading Fort and Smith's truck with items from the property room. (*Id.* at 60, 66.) While Fort and Smith loaded the back of the truck, called the hopper, West and Rodgers were operating the trash compactor blade in the hopper. (Fort Aff. ¶ 13.) At some point, the truck developed a hydraulic leak. (Fort Dep. at 61.) Fort and Smith allege that the hydraulic lead did not affect the blade in the hopper and it was still functioning to crush trash. (Fort Aff. ¶ 13; Smith Aff. ¶ 8–10, ECF No. 28-5.) Smith and Fort called their supervisors and were directed to finish loading the truck, crush and dump the load, then return to headquarters to service the truck. (Smith Aff. ¶ 9.) Mr. West testified during the disciplinary hearing, however, that the hydraulic leak rendered the blade nonfunctional and no further trash items should have been placed in the hopper. (Bench Decision at 4, ECF No. 22-6.)

While the other three RCVOAs were examining the hydraulic leak, Mr. Fort walked to the back of property room, looked around, and picked up a battery charger. (Property Room Video, ECF No. 21.) According to West and the City, Fort was not supposed to be in the back of the property room at that time. (Bench Decision at 4.) He walked back towards to the truck and said "Hey, guys, look, this is what they're throwing away." (Fort Dep. at 61.) Mr. Fort alleges that he put the battery charger in the hopper at the rear of the truck so it would be crushed. (*Id.* ¶ 13.) The City alleges that Mr. Fort hid the battery charger from the property room clerk's view and placed the battery charger in the back of the truck knowing the hopper was broken and that the battery charger would not be crushed. (Bench Decision at 4.)

After Mr. Fort placed the battery charger in the hopper, he reached into the hopper again to adjust it. (Property Room Video.) He and Smith then climbed into their truck to drive away. (Property Room Video.) Before they left, West pulled the battery charger out of the hopper and placed on a nearby forklift. (Fort Dep. at 82; Property Room Video.) The video does not show Fort and Smith's truck compressing the garbage as it drives away. (Property Room Video.)

2

### B. Investigation and Termination

Twelve days later, on June 23, 2015, the City charged Mr. Fort with dishonesty, misuse, abuse or destruction of property, neglect of duty, failure of good behavior, and violation of division anti-junking procedure. (Bench Decision at 1.) "Junking" is the collection of materials for personal use or gain without the authority of the Refuse Collection Division Administrator or designee. (Junking Memorandum, ECF No. 22-5.) The City alleges that Mr. Fort tried to keep the battery charger in violation of the anti-junking policy.

Mr. Fort was immediately removed from his RCVOA job and placed at the front desk. (Fort Aff. ¶ 16.) The City contends it removed Mr. Fort immediately because there is a concern that a refuse driver may get injured while a disciplinary hearing is pending and that would delay the investigation and outcome. (Bench Decision.) Fort and Smith allege, however, that this was contrary to the City's procedure of allowing employees to continue working during an ongoing disciplinary investigation. (*Id.*; Smith Aff. ¶ 14.)

On July 1, 2015, the City held a disciplinary hearing. RCVOAs Rodgers and West testified during the hearing that they saw Mr. Fort place the battery charger in the truck and knew it was wrong. (Bench Decision at 3–4.) Rodgers said he asked Fort, "What are you doing? That's not right" and Fort allegedly responded, "Don't worry about it." (*Id.* at 3.) Rodgers and West also testified that that Mr. Fort came up to them later that day and said, "You are pretty slick, aren't you?" or they "got one over on him," indicating that he had tried to keep the battery charger but later realized they removed it from his truck before he drove away. (Bench Decision at 3.)

Bill Fodor, the Human Resources Manager for Public Services prosecuting the case, requested the Hearing Officer issue a bench decision at the hearing. (*Id.* at 2.) Lauren Hunter, the Hearing Officer, found Rodgers' and West's testimony credible and concluded that Mr. Fort was attempting to take the battery charger in violation of the anti-junking policy. (*Id.* at 4–5.) Based on

3

the June 11, 2015 incident and the fact that Fort had an active fifteen-day suspension on his employment record, she ordered Fort's employment terminated effective immediately because "management has proved by a preponderance of the evidence that Mr. Fort has violated Central Work Rules." (Hunter Dep., Ex. I, ECF No. 22-7.)

C. **Plaintiff Complains About Race Discrimination**

Mr. Fort allegedly complained about race discrimination to his supervisors, human resources, the District Manager, Assistant Director, the City of Columbus Mayor's office, Columbus City Council and others from 2014 until in his termination in 2015. (Fort Aff. ¶¶ 4–6.) In 2014, Fort filed a complaint with the City of Columbus Equal Opportunity Office (EEO) alleging that Black RCVOAs received worse assignments, medical leave, and opportunities to attend training classes than white RCVOAs. (Fort Dep. at 38–44.) The EEO administrator, Richard Melvinson, allegedly shared Fort's concerns with the management of Public Services. Mr. Fort claims that he spoke to his supervisors and others multiple times but he does not remember the specific conversations or complaints. (*Id.* at 44–47.)

Mr. Fort further alleges that he was wrongly disciplined in two incidents in 2013 and 2014. (Fort Aff. ¶¶ 8–10.) First, he was suspended for fifteen days for knocking down power lines. Mr. Fort denies this occurred and alleges an eyewitness also confirmed that he did not knock down the lines. (Fort Aff. ¶ 8.) Second, he was suspended for ten days for an altercation with a white supervisor. Fort avers that the white supervisor instigated the incident and there were eyewitnesses to corroborate his story. (*Id.* ¶ 8.)

D. **Procedural History**

Mr. Fort filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") on February 5, 2016, alleging that the City of Columbus

4

discriminated and retaliated against him based on his race by terminating him. (Fort Dep. at 90.) The EEOC issued a Right to Sue Letter on August 8, 2018.

Mr. Fort filed suit in this Court on November 5, 2018, against the City of Columbus and the American Federal of State, County and Municipal Employees (AFSCME). (Case No. 2:18-cv-1374.) He voluntarily dismissed the suit without prejudice on December 18, 2019. (2:18-cv-1374, ECF No. 27.) Mr. Fort then filed suit again on December 16, 2020, against the City of Columbus, alleging race discrimination and retaliation under Title VII and Ohio law, violations of the Fourteenth Amendment Equal Protection clause, and tortious violation of public policy under Ohio law. (ECF No. 1.) Defendant City of Columbus moved for summary judgment. The motion is ripe for review.

## II. STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions" of the record which demonstrate "the absence of a genuine issue of material fact." *Id.* at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict

5

for the nonmoving party." *Id.* at 248; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) ("The requirement that a dispute be 'genuine' means that there must be more than some metaphysical doubt as to the material facts."). Consequently, the central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234–35 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 251–52).

### III. ANALYSIS

Defendant moves for summary judgment on all claims, arguing: (1) Plaintiff's § 1983 claim is barred by the statute of limitations; (2) Plaintiff does not have a cause of action for violation of public policy; (3) there is no evidence of discrimination; (4) there is no evidence of retaliation; and (5) Plaintiff did not receive a proper notice of right to sue.

#### A. 42 U.S.C. §1983 Fourteenth Amendment Equal Protection

Defendant moves for summary judgment on Plaintiff's § 1983 claim on the basis that it is barred by the statute of limitations. (Def.'s Mot. at 10.) Plaintiff disagrees that his claim is untimely because it was filed upon his receipt of the right to sue letter. (Pl.'s Resp. at 20.)

Section 1983 claims are subject to state statutes of limitations but federal law determines when the statute of limitations period begins or, in other words, when the claim accrues. *Wallace v. Kato*, 549 U.S. 384, 388 (2007) ("[T]he accrual date of a § 1983 cause of action is a question of federal law that is not resolved by reference to state law.") In Ohio, "the appropriate statute of limitations for 42 U.S.C. § 1983 civil rights actions…requires that actions…be filed within two years after their accrual." *Browning v. Pendleton*, 869 F.2d 989, 992 (6th Cir. 1989) (en banc). Accrual occurs when the plaintiff "knows or has reason to know of the injury which is the basis of his action." *Cooey v. Strickland*, 479 F.3d 412, 416 (6th Cir. 2007).

6

Mr. Fort's § 1983 claim accrued on July 1, 2015, when he was terminated and had reason to know the alleged injury to his rights occurred. He must have filed his suit within two years from that date—July 1, 2017. However, Mr. Fort did not file his first suit until November 5, 2018, and his second suit until December 16, 2020, long after the statute of limitations period ended. Therefore, Defendant is entitled to summary judgment on the § 1983 claim because it was filed after the statute of limitations period.

### B. Tortious Violation of Public Policy

Defendant moves for summary judgment on Plaintiff's claim for tortious violation of public policy, arguing Plaintiff cannot bring such claim as a union employee. (Def.'s Mot. at 17.) Ohio recognizes a claim for wrongful termination in violation of public policy as an exception to Ohio's employment-at-will doctrine. *Greeley v. Miami Valley Maintenance Contrs.*, 49 Ohio St.3d 228 (1990). The claim is available if (1) there is a clear public policy manifested in a state or federal constitution, statute, regulation, or common law; and (2) under the circumstances, the plaintiff's termination is contrary to that policy. *Id.*

Mr. Fort cannot bring a claim for violation of a public policy because he was a member of a union, not an employee at will. *See Haynes v. Zoological Soc. of Cincinnati*, 73 Ohio St.3d 254, 254, (1995); *Klepsky v. United Parcel Serv.*, 489 F.3d 264, 271 (6th Cir. 2007) ("[B]ecause Klepsky is not an at-will employee, we affirm the district court's dismissal of Klepsky's [public policy] claim pursuant to *Haynes*."); *Pearson v. Ford Motor Co.*, 747 F. Supp. 2d 966, 974 (S.D. Ohio 2010) ("as a union member Plaintiff was not an at-will employee, and therefore, under the law he cannot assert a claim for wrongful discharge in violation of public policy"). Plaintiff's tortious violation of public policy claim is dismissed.

7

## C. Race Discrimination

Under Title VII and the Ohio Revised Code § 4112.02, an employer may not "discharge without cause" an employee because of his "race, color, religion, sex…" Courts apply federal case law to employment discrimination claims under the Ohio Revised Code § 4112. *See Carter v. Univ. of Toledo*, 349 F.3d 269, 272 (6th Cir. 2003) (analyzing state and federal employment discrimination claims under federal case law because Ohio's § 4112 requirements are the same as Title VII). Mr. Fort's federal and state race discrimination claims are analyzed together under federal law.

An employee may prove race discrimination based on direct or circumstantial evidence. *Johnson v. Kroger Co.*, 319 F.3d 858, 864 (6th Cir. 2003). Mr. Fort does not have direct evidence of race discrimination. Race discrimination claims based on circumstantial evidence are evaluated under the *McDonnell Douglas* burden-shifting framework. *Bush v. Compass Grp. USA, Inc.*, 683 F. App'x 440, 451 (6th Cir. 2017) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). First, a plaintiff must demonstrate a prima facie case of discrimination by showing: "(1) he is a member of a protected class; (2) he was qualified for his job; (3) he suffered an adverse employment decision; and (4) he was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008). If the plaintiff makes such a showing, the burden shifts to the defendant, who must "offer evidence of a legitimate, non-discriminatory reason for the adverse employment action." *Id.* A successful articulation on the part of the defendant then shifts the burden back to the plaintiff to prove that the defendant's proffered reason was "merely a pretext for discrimination." *Id.* at 391–92.  Establishing a prima facie case is not an "onerous" burden, but one easily met. *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 776 (6th Cir. 2016).

8

The City of Columbus is entitled to summary judgment on Plaintiff's Title VII discrimination claim because he does not present evidence of the fourth element of his prima facie case—that he was replaced by a person outside his protected class or was treated differently than a similarly situated individual outside his protected class. Plaintiff alleges he was treated differently than similarly situated employees, but as Defendant asserts, Plaintiff's comparators are not similarly situated. (Def.'s Mot. 11.)

In the disciplinary context, a similarly situated individual is one that has "dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992). The plaintiff "is not required to show that his proposed comparator's actions were identical to his own." *Colvin v. Veterans Admin. Med. Ctr.*, 390 F. App'x 454, 458–59 (6th Cir. 2010). But he and his proposed comparator must have engaged in acts of comparable seriousness. *Clayton v. Meijer, Inc.*, 281 F.3d 605, 612 (6th Cir. 2002) ("The employer's more severe treatment of more egregious circumstances simply cannot give rise to an inference which would support the establishment of a prima facie case of discrimination.").

Plaintiff offers two refuse workers who were charged with theft or junking, as he was, as comparators. First, Kent Wheeler, a Caucasian employee, took a small engine in violation of the anti-junking policy. Mr. Wheeler resigned before the City fired him. (Wellman Dep. at 13–14, ECF No. 22-9.) Mr. Fort contends that he was not given the chance to resign like Wheeler and therefore was treated differently. This argument is not persuasive. Resignation is a decision initiated by the employee, not the City of Columbus. Mr. Fort had ample time to resign between the incident on June 11, 2015, and his termination on July 1, 2015. His choice not to resign does is not evidence of how the City treated him. Furthermore, there is no evidence of Wheeler's

9

disciplinary history or whether he had similar prior suspensions to Fort. Mr. Wheeler is not a proper comparator.

Second, Plaintiff offers James Stewart, a Caucasian employee who took anti-freeze. The City found Steward was guilty of violating the anti-junking policy and gave Stewart a last chance agreement. (Wellman Dep. at 13; Fort Aff. ¶ 25.) Plaintiff argues that he was treated differently than Stewart because he was fired instead of receiving a last chance agreement. (Pl.'s Resp. at 13.)

The City follows the following progressive discipline steps: an oral reprimand, a written reprimand, one-day suspension, three-day suspension, five-day suspension, ten-day suspension, fifteen-day suspension, and finally employment termination. (Wellman Aff. ¶ 10, ECF No. 23-1.) According to the policy, each time an employee is disciplined, it is more severe. (*Id.* at ¶ 10.) Mr. Fort's personnel file documents a three-day disciplinary suspension in March 2013, a five-day disciplinary suspension in July 2013, a ten-day disciplinary suspension in March 2014, and a fifteen-day disciplinary suspension in October 2014. (*Id.* ¶ 12; *see* Fort Dep. at 51–57.) Thus, the next step in progressive discipline was employment termination, which is what Mr. Fort received. Mr. Fort cannot argue that he was treated differently than Stewart under the progressive discipline policy without providing evidence that he also received a fifteen-day suspension during his employment. That evidence is not in the record.

Finally, Plaintiff argues that the City has a "zero tolerance" policy for junking and anyone caught junking is immediately terminated. Therefore, Wheeler and Kent should also have been fired. (Pl.'s Resp. at 14.) The deposition testimony that Plaintiff cites to, however, does not support his contention. Ms. Hunter, the hearing officer, explained that "zero tolerance" means an employee can be terminated for theft with no prior discipline; but they may receive other steps of progressive discipline. (Hunter Dep. at 18–20.) Her bench opinion also indicates that termination was appropriate based on the fact that he had a prior fifteen-day suspension. (Bench Decision at 6.)

10

Defendant is entitled to summary judgment on the Title VII and Ohio law discrimination claims because Plaintiff fails to establish the fourth element of a prima facie case—that he was treated differently than similarly situated employees outside his protected class.

### D. Retaliation

Like discrimination claims, retaliation claims under Title VII and Ohio law are analyzed the same way under federal law. *See Mengelkamp v. Lake Metro. Hous. Auth.*, 549 F. App'x 323, 329–30 (6th Cir. 2013). To establish a prima facie case of retaliation under federal or Ohio law, a plaintiff must show that (1) he engaged in Title VII protected activity, (2) the employer knew of this activity, (3) the employer took an adverse employment action against him, and (4) that the adverse employment action was causally connected to the protected activity. *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 587–88 (6th Cir. 2009). "The burden of establishing a prima facie case in a retaliation action is not onerous, but one easily met." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000). "After proving the existence of a prima facie case, the burden [of production] shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse action." *Abbott v. Crown Motor Co.*, 348 F.3d 537, 542 (6th Cir. 2003) (quoting *Nguyen*, 229 F.3d at 562.) Then, the plaintiff must then demonstrate that the proffered reason was "pretext for discrimination." *Id.*

Even if Plaintiff can establish a prima facie case of retaliation, he does not provide sufficient evidence that the City's reason for terminating him is pretext. A plaintiff can demonstrate pretext by showing that the proffered reason "(1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Id.* Defendant argues that Plaintiff fails to show that the proffered reason for termination was pretext for race discrimination or retaliation because there is indisputable evidence that he violated company policy and that he was fired for violating policy. (Def.'s Mot. at 13–14.) Plaintiff argues

11

that the charge and the decision had no basis in fact because there was no evidence Plaintiff stole anything, the City did not properly investigate the allegations, and the City rushed its judgment by entering a bench decision. (Pl.'s Resp. at 15.)

Whether the City accurately assessed the June 11, 2015 incident is not for the Court to decide. As the Sixth Circuit has stated, "arguing about the accuracy of the employer's assessment is a distraction because the question is not whether the employer's reasons for a decision are *right* but whether the employer's description of its reasons is *honest*." *Hardesty v. Kroger Co.*, 758 F. App'x 490, 493 (6th Cir. 2019) (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir. 1998)) (emphases in original). The bench opinion and Ms. Hunter's, the Hearing Officer's, deposition testimony shows that she reasonably relied on the facts before her in deciding to terminate Plaintiff and there is no evidence that the decision was a pretext for retaliation.

At the disciplinary hearing, Ms. Hunter found Rodgers and Wheeler's testimony more credible than Plaintiff's. She noted several inconsistencies in Plaintiff's testimony. For example, he testified that "he was following instructions by picking up loose items for the bulk trash, yet he also testified that [the property room clerk] designated the bulk trash on a pallet by pallet basis." The pallets in the back of the room were not designated for pick up, and neither the clerks nor the other three RCVOAs did anything near the back of the room. Yet Mr. Fort walked around the back of the room, scanned the pallets in the back, picked up the single battery charger when the property clerk left the room, and resituated it in the hopper prior to driving away. Ms. Hunter concluded that it was likely that Fort resituated the battery charger in the hopper so that other trash did not damage it in transport. Plaintiff would not have needed to resituate trash in the hopper if it was going to be crushed. (Bench Decision at 5.) Ms. Hunter also relied on Rodgers and West's testimony that when they asked Fort what he was doing when he put the battery charger in the hopper he said, "Don't worry about it." Later that day, Fort approached Rodgers and West and

alleged said, "You are pretty slick, aren't you?" or the "got one over on him." Ms. Hunter inferred that Fort was talking about how they had pulled the battery charger out of the hopper right before he drove away and returned it to the property room without him knowing. (*Id.* at 3.)

Viewing the facts in a light most favorable to Mr. Fort and drawing all reasonable inferences in his favor, a reasonable jury could not find that the proffered reasons for his termination were pretext. First, Ms. Hunter's bench decision and deposition indicates that she reasonably relied on the charge, video, and testimony before her in concluding that Mr. Fort was guilty of junking. In other words, her decision had a basis in fact. Second, there is no evidence that Ms. Hunter was motivated by Plaintiff's prior race discrimination complaints. In fact, it is undisputed that Ms. Hunter was unaware of the complaints. Third, Plaintiff also cannot show that his conduct was insufficient to warrant termination. Consistent with the progressive discipline policy, Plaintiff's next proper punishment was termination because he already had one-day, three-day, five-day, ten-day, and fifteen-day suspensions on his record. In sum, Plaintiff does not present sufficient evidence to establish a genuine issue of fact as to whether the decision to terminate him was pretext for retaliation. Defendant is entitled to summary judgment on the retaliation claim.

## IV. CONCLUSION

For the reasons stated above, the Court **GRANTS** Defendant City of Columbus' Motion for Summary Judgment (ECF No. 23). The Clerk is directed to close this case.

**IT IS SO ORDERED.**

**8/24/2022**                                       **s/Edmund A. Sargus, Jr.**
**DATE**                                                    **EDMUND A. SARGUS, JR.**
                                                                    **UNITED STATES DISTRICT JUDGE**